**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

|  |  |  |
|---|---|---|
| CHESAPEAKE OPERATING, INC., an Oklahoma corporation, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | NO. CIV-12-55-D |
| PINTAIL PRODUCTION CO., INC., a Texas corporation, | ) ) ) ) | |
| Defendant, | ) ) ) | |
| vs. | ) ) ) | |
| INDIGO MINERALS, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Third-Party Defendant. | ) | |

**ORDER**

Before the Court is the motion for summary judgment [Doc. No. 49] of Plaintiff Chesapeake Operating, Inc. ("Chesapeake"), seeking judgment on the counterclaim asserted by Pintail Production Co., Inc. ("Pintail"). Third-party Defendant Indigo Minerals, LLC ("Indigo") adopted Chesapeake's motion. Pintail timely responded[1], replies were filed, and the motion is at issue.

Background:

Chesapeake brought this action to recover from Pintail amounts allegedly due and owing on unpaid joint interest billings submitted to Pintail for services performed by Chesapeake as the

---

[1] Pintail's response also argues that the evidence establishes it is entitled to summary judgment on the counterclaim, and it asks the Court to so rule. The Court will not consider Pintail's argument because it did not file a proper summary judgment motion, and its attempt to do so in the response is prohibited by the Local Civil Rules. "A response to a motion may *not* also include a motion or a cross-motion made by the responding party." LCvR 7.1(c) (emphasis added).

operator of an oil and gas unit in Washita County, Oklahoma. The summary judgment motion does not address these claims, but seeks judgment only on Pintail's counterclaim and third-party claim.

Pintail's counterclaim and third-party claim do not involve the Washita County, Oklahoma unit. Instead, the claims are based on Pintail's interest in the H. D. Browning Gas Unit No. 1, located in Panola County, Texas (the "Browning Unit"), which is governed by a joint operating agreement ("Browning JOA") executed by Pintail and Craton Energy Company II, LLC ("Craton"). Pursuant to a 2006 merger transaction, Chesapeake acquired Craton's Browning Unit interest, and became the operator. As more fully explained, *infra*, the Browning JOA contains a "tag-along" provision which is triggered if the operator sells its interest in the Browning Unit; if so, Pintail has the right to require the purchaser to also buy Pintail's interest in the unit. In 2009, Chesapeake sold interests, including its Browning Unit interest, to Indigo. Pintail alleges that it was not notified of the sale and was thus deprived of its option to exercise its tag-along right. Pintail asks the Court to declare that its tag-along right is currently enforceable, and it seeks an order of specific performance allowing it to exercise that right. Alternatively, Pintail asserts that it was damaged by the failure of Chesapeake and Indigo to allow Pintail to exercise its tag-along right, and it seeks damages sufficient to place it in the same position it would have occupied if that right had been honored in 2009. Finally, Pintail seeks an accounting for costs and production from the Browning Unit wells in which it owns an interest.

Chesapeake and Indigo argue that Pintail's attempt to exercise tag-along rights is barred because the time period for election expired. Alternatively, they contend that its claim is barred by waiver, laches, and estoppel. With respect to Pintail's alternative claim for damages, they argue damages are not an available remedy and, even if they could be recovered, Pintail has suffered no

damages. Further, they contend that damages based on lost profits due to market decline are barred because the JOA prohibits recovery of consequential damages. Finally, they argue that Pintail has failed to mitigate any damages that could otherwise be recovered.

Summary judgment standard:

Summary judgment is proper where the undisputed material facts establish that a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To dispute a material fact, the non-moving party must offer more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict" in its favor. *Id.* "[T]he requirement that a dispute be 'genuine' means simply that there must be more than 'some metaphysical doubt as to the material facts.'" *Anderson*, 477 U.S. at 260-261(quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The facts and reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).

If the undisputed facts establish that a party cannot prove an essential element of a cause of action, the movant is entitled to judgment on that cause of action. *Celotex*, 477 U.S. at 322. The party seeking summary judgment on this basis need not disprove the opposing party's claim; it must only point to a lack of evidence on an essential element of that claim. *United States v. AMR Corp.*, 335 F. 3d 1109, 1113 (10th Cir. 2003); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The burden then shifts to the claimant to go beyond the pleadings and present facts, admissible in evidence, from which a rational trier of fact could find in its favor; conclusory

arguments are insufficient, as the facts must be supported by affidavits, deposition transcripts, or specific exhibits incorporated therein. *Adler,* 144 F. 3d at 671-72.

"The purpose of a summary judgment motion is to assess whether a trial is necessary." *Berry v. T-Mobile USA, Inc.,* 490 F. 3d 1211, 1216 (10th Cir. 2007). "In other words, there must be evidence on which the jury could reasonably find for" the non-moving party. *Id.*

The record before the Court:

It is not disputed that, in a 2006 merger transaction, Chesapeake acquired Craton's working interest in the Browning Unit and that, at the time, Pintail owned a working interest in the unit. Unit operations were governed by the Browning JOA, executed by Craton and Pintail on August 1, 2005. Browning JOA, Chesapeake Ex. 2. The parties agree that, after acquiring Craton's interest, Chesapeake began operating the Browning unit and, in that capacity, it distributed to Pintail joint interest billings ("JIBs"), revenue statements, and related information.

The Browning JOA contains a provision, identified by the parties as a "tag-along" provision, which was included at the request of Pintail's President, Harvey H. Mueller, II ("Mueller"), who acted as Pintail's representative in negotiating the Browning JOA. Mueller dep., Chesapeake Ex. 1, pp. 22-23. The parties agree that the provision applies if the operator sells all or part of its interest in the area covered by the Browning JOA. They further agree that, in the event of a sale, the provision gives Pintail the option to require the purchaser to also purchase Pintail's interest in the same properties, according to the same terms and provisions of the transaction governing the operator's sale of its interest.

The Browning JOA tag-along provision states as follows:

> Should Operator [sic] any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right for a period of ten (10) days after the notice is delivered, to sell for the stated consideration on the same terms and conditions [sic] the interest owned by such parties in the Contract Area which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all parties. However, there shall be no such right to sell in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interest by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

Browning JOA, Article VIII, p. 15.    When Chesapeake acquired Craton's Browning Unit interest, Pintail inquired of Craton whether the transaction triggered the tag-along provision. Chesapeake Ex. 3. However, the parties now agree that the provision did not apply because Chesapeake's acquisition was part of a merger transaction, and mergers are expressly excluded from the provision.

In 2009, Chesapeake sold certain oil and gas properties, including its interest in the Browning Unit, to Indigo. The terms of the sale are set out in a purchase and sale agreement executed on June 3, 2009, with an effective date of March 1, 2009. *See* Chesapeake Ex. 3. The closing date was June 30, 2009. Affidavit of Rudy H. Sims, Jr., Chesapeake Ex. 5, ¶ 5.

There is no evidence that Chesapeake or Indigo notified Pintail of the prospective sale prior to the June 30, 2009 closing date. The record reflects that the sale, including the $218 million total sale price, was reported on Indigo's website. It was also reported in industry publications. *See, e.g.,*

5

*A&D Transactions MarketAlert,* June 12, 2009, Pintail Ex. 8.

Approximately six weeks after the June 30 closing, Indigo sent to Pintail and other interest owners an August 17, 2009 notice advising them that, effective with July, 2009 sales, Indigo "began disbursing on properties it acquired in the Ark-La-Tex region from Chesapeake Energy Corporation." Chesapeake Ex. 6. The communication adds that "[f]urther information regarding Indigo and this acquisition may be obtained by visiting Indigo's website," provides the web site information, and invites recipients to contact Indigo if they had questions. *Id.* Although described by Chesapeake as a "letter" to Pintail, the document is not in a letter format, and it does not identify any addressee, but is directed to "Interest Owners." *Id.*

A separate August 17, 2009 communication was sent to interest owners by Indigo's "JIB Department." Chesapeake Ex. 7. This communication also does not identify specific addressees, but is directed to the attention of "accounts payable," and states: "[e]ffective 03/01/09, Indigo Minerals LLC acquired certain properties from Chesapeake Energy Corporation. Please make all applicable JIB payments to the following address." *Id.* Indigo provides its mailing address and department number for the submission of JIB payments, and again advises recipients to contact Indigo with questions; it includes a telephone number and email address for that purpose. Chesapeake Ex. 7. The August 17 communications do not expressly reference the Browning Unit or identify the specific interests purchased by Indigo from Chesapeake.

Pintail received the August 17 communications from Indigo and did not respond or seek further information regarding the communications or the acquisition. Mueller dep., Chesapeake Ex. 1, p. 66, lines 1-7. However, all JIBs thereafter were sent by Indigo, along with other information regarding operation of the Browning Unit wells. Pintail did not communicate with Chesapeake

concerning the Browning Unit after the closing of the sale to Indigo. Mueller dep., Chesapeake Ex. 1, pp. 45, 47.

The record reflects that Pintail has never sought to sell its Browning Unit interest to any party. In a June 25, 2007 written proposal, Chesapeake offered to purchase that interest for $4,075,400.00. Chesapeake Ex. 4. On or about July 19, 2007, Mueller verbally rejected Chesapeake's offer. Mueller dep., Chesapeake Ex. 1, pp. 66-67. No further negotiations occurred. Mueller acknowledges that there was a ready market for its interest at all times after the June 30, 2009 closing of Indigo's purchase of the Browning Unit. *Id.*, p. 46.

During the time period in which Chesapeake was operator of the Browning Unit, Pintail did not directly pay its share of monthly operating expenses reflected on JIBs, although it paid its share of expenses reflected on Authorizations for Expenditures. Mueller dep., Chesapeake Ex. 1, p. 33, lines 12-16. Pintail's share of monthly operating expenses was "netted" by Chesapeake against Pintail's revenues. *Id.* at lines 17-19. Pintail received monthly JIBs from Chesapeake, which Mueller personally reviewed, along with all other information sent to Pintail by Chesapeake. *Id.*; p. 17, lines 4-25. Pintail does not dispute that, after Indigo acquired the Browning Unit, it began sending JIBs and other information to Pintail. Mueller testified that he understood this meant Indigo was now the operator. Mueller dep., Pintail Ex. 1, p. 37, lines 6-11.

During the time period in which it operated the Browning Unit, Chesapeake held in suspense some proceeds attributable to Pintail's interest, and Mueller understood that Chesapeake began that practice when it became the operator. Mueller dep., Pintail Ex. 1, p. 35, lines 1-11. He never asked Chesapeake to release suspended funds. *Id.*, lines 11-14. Mueller also knew that Indigo continued to hold proceeds in suspense after it acquired the Browning Unit, and he did not request that it

7

release any funds.

In an April 4, 2012 letter, Indigo asked that Pintail confirm its ownership interest in specified properties in the Browning unit. Pintail Ex. 3. Indigo advised that, when it acquired the interest from Chesapeake in 2009, Pintail's interest was being held in suspense, and Indigo had continued the suspense status. Verification of Pintail's interest was requested so that the funds could be released to Pintail. *Id.* Prior to this lawsuit, Pintail did not ask Indigo to release the suspended funds. Mueller dep., Chesapeake Ex. 1, p. 40, lines 5-7.

Mueller is president and sole owner of Pintail, and is a petroleum engineer with approximately 30 years experience in the oil and gas industry. *Id.* at pp. 8-10. Pintail owns interests in over one thousand oil and gas properties throughout the United States, but does not operate any wells. *Id.* at pp. 11-12. Pintail has two other employees, and Mueller personally reviews all communications and information regarding Pintail's interests. Mueller dep., p. 17.

Although Pintail contends that Chesapeake's June 2009 sale to Indigo invoked the tag-along provision, Pintail did not seek to invoke its rights under that provision at any time until filing its counterclaim in this lawsuit on June 12, 2012. Mueller dep., Chesapeake Ex. 1, p. 45. Pintail asserts that it did not know Chesapeake had sold its interest in the Browning Unit until after this lawsuit was filed. Mueller dep., pp. 35-36.

Application:

The parties agree that Texas law applies to Pintail's counterclaim and third-party claim. Indigo filed a motion [Doc. No. 48] seeking a ruling that Texas law governs these claims, and there was no objection to that motion. Furthermore, the Browning JOA on which Pintail's claims are based expressly states that it shall be governed by Texas law. JOA, p. 16. Accordingly, the Court

will apply Texas law.

In support of summary judgment, Chesapeake and Indigo first argue that, under Texas law, Pintail is barred from asserting its tag-along right at this time because it failed to do so within the ten-day time period prescribed by the JOA. Browning JOA, p. 15. Pintail argues, however, that the ten-day period is inapplicable because, contrary to the express language of the tag-along provision, Chesapeake did not provide formal advance notice to Pintail regarding the proposed sale, and the ten-day period does not commence until such notice is provided. *Id.* Pintail argues that actual notice containing the required information was not provided until after this lawsuit commenced and that it did not have sufficient information to allow it to determine whether to exercise its tag-along right until Chesapeake responded to interrogatories and document requests. Chesapeake and Indigo argue that the evidence shows Pintail had constructive notice of the sale sufficient to trigger the ten-day option period.

The tag-along provision requires Chesapeake, as operator, to "promptly give written notice" of its desire to sell, but does not set a deadline or otherwise define what constitutes prompt notice. It does, however, require that the notice provide "full information concerning its proposed disposition." Full information "shall include the name and address of the prospective transferee," the "purchase price, a legal description sufficient to identify the property, and all other terms of the offer." Browning JOA, p. 15.

Although Chesapeake and Indigo concede that Chesapeake did not provide to Pintail formal written notice of the prospective sale, they argue that Pintail had constructive notice of the sale because it was reported in industry publications and on Indigo's website. Further, they contend that, even if that knowledge was not sufficient, Pintail had notice of the sale when it received the August

9

17, 2009 communications from Indigo specifically referencing the acquisition and advising that, as a result of that acquisition, Indigo would be distributing JIBs. Chesapeake Exs. 6 and 7.

Whether Pintail had sufficient notice to trigger its obligations under the tag-along provision is determined by interpretation of the JOA provision and the application of Texas law. In this case, the parties do not contend that the tag-along provision is ambiguous.

The interpretation of an unambiguous contract is a question of law for the Court. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W. 3d 248, 252 (Tex. 2009). Interpretation and construction of the language of a JOA is governed by the rules of construction applicable to contracts. *XTO Energy, Inc. v. Smith Production, Inc.*, 282 S.W. 3d 672, 676 (Tex. Civ. App. 2009). In *XTO Energy*, the Court explained the rules of construction:

> In construing the language of the JOAs, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contracts. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). To ascertain the parties' true intentions, we examine the JOAs in their entirety in an effort to harmonize and give effect to all of their provisions so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). Terms in a contract are given their plain, ordinary and generally accepted meanings unless the contract itself shows the terms to be used in a technical or different sense. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). Whether a contract is ambiguous is a question of law for the court. *Id.* A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* However, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003).

*Id.*

Although the tag-along provision does not define what is meant by "prompt" notification by the operator of a proposed sale, the Court need not determine the meaning of "prompt notice" because it is undisputed that at no time did Chesapeake provide to Pintail actual written notice of

the acquisition containing the information required by the tag-along provision.  As the provision clearly states, such written notice was required to identify the name and address of the acquiring party, as well as the purchase price and "a legal description sufficient to identify the property, and all other terms of the offer."   Browning JOA,  p. 15.  Because Chesapeake admittedly did not provide notice containing that information, whether notification was  promptly given is not at issue.

Instead, the focus of the parties' arguments is whether Pintail otherwise received notice sufficient, under Texas law, to trigger the time period for the exercise of its tag-along rights. Chesapeake and Indigo argue that, despite Chesapeake's failure to provide the specific notice required by the tag-along provision, Texas law nevertheless charges Pintail with notice under the circumstances.  According to their contention, Pintail had sufficient information to constitute constructive notice, and it was obligated to investigate further to determine the facts surrounding the acquisition; because Pintail admittedly did not do so, Chesapeake and Indigo contend it cannot rely on the tag-along provision to belatedly exercise its right, and it has waived that right.

According to Texas law,  notice is not limited to "express information of a fact;" instead, "whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained." *Champlin Oil & Refining Co. v. Chastain*, 403 S.W. 2d 376, 388 (Tex. 1966) (internal quotations omitted). "Means of knowledge with the duty of using them are in equity equivalent to knowledge itself." *Id.* Consequently, "in legal parlance, actual knowledge embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed." *Id.* at 388-89. Thus, a person "who has learned facts that would cause a reasonable person to inquire further must proceed

with a reasonable and diligent investigation and is charged with the knowledge of all facts such an investigation would have disclosed." *Rahr v. Grant Thornton LLP*, 142 F. Supp. 2d 793, 797 (N.D. Tex. 2000). Where a contractually required notice is deficient, the holder of a contractual right is nevertheless required to exercise diligence if he obtains some notice that his right may be impacted. *Comeaux v. Suderman*, 93 S.W. 3d 215 (Tex. Civ. App. 2002). In such circumstances, "technical deficiencies in the notice–or even no notice–cannot revive a right he declined" by failing to ascertain the facts which could have been learned through the exercise of reasonable diligence. *Id.* at 222.

These rules have been applied to notice of a contractual right to exercise an option, including preferential rights to purchase property, or rights of first refusal regarding sales or purchases. *See, e.g., A.G.E., Inc. v. Buford,* 105 S.W. 3d 667 (Tex. Civ. App. 2003); *Comeaux,* 93 S.W. 3d 215; *Koch Industries, Inc. v. Sun Company, Inc.*, 918 F.2d 1203 (5th Cir. 1990). The parties in this case do not cite Texas decisions expressly applying the rules to tag-along rights in a joint operating agreement, and the Court has not located any such decisions. However, the parties cite no authority which requires application of a different rule where tag-along rights are involved. Accordingly, the foregoing Texas law regarding notice applies to the facts of this case.

Chesapeake and Indigo argue that the undisputed evidence shows Pintail had at least constructive notice of the acquisition and sufficient information to charge it with the duty of further inquiry to ascertain the details necessary to determine if it should exercise its tag-along right. As the movants point out, the record shows that the acquisition was reported in market publications, at least one of which is submitted as a Pintail exhibit. *A&D Transactions Market Alert* dated June 12, 2009, Pintail Ex. 8. While the evidence does not establish that Pintail personnel were actually aware of this publication as of its June 12, 2009 date, its existence evidences the fact that the transaction

was publicly reported, and, thus, generally known in the industry.

Even if Pintail did not have access to publicly reported information prior to the June 30, 2009 closing date, the evidence shows that Pintail subsequently received information sufficient to constructively notify it of the acquisition when it received the August 17, 2009 communications from Indigo evidencing that Indigo acquired the interest and was performing the functions of an operator. Chesapeake Exs. 6 and 7. These communications expressly referenced Indigo's acquisition of Chesapeake's interest and expressly provided means of obtaining more specific information, as one of the communications stated that the details of the acquisition were available on Indigo's website. Chesapeake Ex. 6. The Court agrees that this was sufficient to constitute at least constructive notice to Pintail, triggering its duty under Texas law to take reasonable action to obtain additional information. Pintail admittedly did not check the website, contact Indigo, or otherwise seek to obtain additional information regarding the referenced acquisition. Mueller dep., Chesapeake Ex. 1, p. 66, lines 1-7. Nor did Pintail contact Chesapeake regarding the Browning Unit. *Id.*, pp. 45, 47. Pintail admittedly did not do so despite the fact that its president and sole owner has extensive experience in purchasing and selling oil and gas interests and has sufficient industry knowledge to readily obtain the type of information needed to determine whether to exercise the tag-along right in the Browning JOA.[2] Pintail offers no evidence that it could not readily access the Indigo website or otherwise inquire about the details of the acquisition described in the August 17, 2009 communications it received from Indigo. Had Pintail made further inquiry, it would have obtained the information it now complains it never knew, and the ten-day option

---

[2] As noted, *supra*, the record shows that Pintail made an inquiry regarding the potential application of its tag-along right when Chesapeake acquired Craton's interest in 2006. Chesapeake Ex. 3.

period thus expired long ago, and in any event, Pintail has waived its option right.

Pursuant to Texas law, a party can waive contractual rights, and waiver occurs when a party. either intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right. *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 722 (Tex. Civ. App. 2004.). Proof of an intent to relinquish a known right can be supplied by an express renunciation of a known right or by "silence or inaction for a period of time long enough to show an intention to yield the known right." *Id*. Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, the question becomes one of law. *Jernigan v. Langley*, 111 S.W.3d 153, 156-57 (Tex.2003) (per curiam).

The Court concludes that, under the undisputed facts and Texas law, Pintail cannot now exercise a right based on facts which were readily ascertainable through the exercise of reasonable diligence at least by August 17, 2009. Pintail, through its failure to act, waived its right under the tag-along provision. It offers no reasonable explanation for its failure to attempt to exercise that right until more than three years after the acquisition on which it now relies. Chesapeake and Indigo are entitled to summary judgment on Pintail's counterclaim and third party claim seeking specific performance of the tag-along right in the Browning JOA. Because Pintail's undisputed conduct evidences a waiver of that right, the Court need not address its alternative requests for money damages allegedly resulting from delay in obtaining the benefits of a right it waived.

<u>Conclusion:</u>

For the foregoing reasons, the motion for summary judgment [Doc. No. 49] of Chesapeake, in which Indigo joins, is GRANTED. Chesapeake is entitled to judgment on the counterclaim seeking specific enforcement and/or money damages, and Indigo is entitled to judgment on the third-

party claim seeking those remedies. Because the parties do not address Pintail's additional claim for an accounting with respect to certain wells in the Browning Unit, that claim is not the subject of this Order.   The case will proceed on Chesapeake's claims and Pintail's accounting request.

   IT IS SO ORDERED this 11th day of October, 2013.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE